# Exhibit 40

# OPUS2

Skatteforvaltningen v Solo Capital Partners LLP & Others

Day 20MT

May 24, 2024

Opus 2 - Official Court Reporters

Phone: 020 3008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | Friday, 24 May 2024                                                    |
| 2  | (9.30 am)                                                              |
| 3  | Housekeeping                                                           |
| 4  | MR JUSTICE ANDREW BAKER: Good morning, Mr Jones.                       |
| 5  | MR JONES: Good morning. My Lord, one very small point                  |
| 6  | I wish to raise and I'm not going to say anything that                 |
| 7  | Mr Shah shouldn't hear and I'm speaking with                           |
| 8  | Mr Goldsmith's agreement.                                              |
| 9  | My Lord, we had between us a disagreement yesterday,                   |
| 10 | as you recall, as to what each of us had said to the                   |
| 11 | other in relation to today's evidence.                                 |
| 12 | MR JUSTICE ANDREW BAKER: Yes.                                          |
| 13 | MR JONES: I found myself in the early hours of this morning            |
| 14 | wide awake reliving those conversations and I'm now                    |
| 15 | quite confident that he is right and that I was wrong                  |
| 16 | and what I had done in the fog of war in the afternoon                 |
| 17 | was to cross-wire the consequence of those discussions                 |
| 18 | and what I had reported to my client with the express                  |
| 19 | words that he and I had exchanged, so I have approached                |
| 20 | him this morning, corrected the relationship between him               |
| 21 | and I, he wasn't I think unduly concerned by it, but it                |
| 22 | is right that I correct it, and it is right that your                  |
| 23 | Lordship is told.                                                      |
| 24 | MR JUSTICE ANDREW BAKER: Very good Mr Jones. While you are             |
| 25 | on your feet, not relating to that, but —— not relating                |

1

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | to that specific point but relating to those same                      |
| 2  | conversations, have I understood correctly that whatever               |
| 3  | else they did or did not do, they identified between you               |
| 4  | as legal teams what are the discrete topics Mr Goldsmith               |
| 5  | is going to cross-examine?                                             |
| 6  | MR JONES: No, we left that entirely to Mr Rabinowitz and               |
| 7  | Mr Goldsmith, because they could have done one of two                  |
| 8  | things. He could have picked up the chronology as it                   |
| 9  | stood at the time or taken a discrete topic. We had no                 |
| 10 | reason to interfere with that, so we haven't discussed                 |
| 11 | it.                                                                    |
| 12 | MR JUSTICE ANDREW BAKER: Mr Goldsmith, as I have understood            |
| 13 | it from what Mr Rabinowitz therefore said to me, the                   |
| 14 | intention —— and I think that is the reason I put it                   |
| 15 | that way to Mr Shah —— was that you were somewhat                      |
| 16 | interrupting the more general chronological narrative                  |
| 17 | flow of Mr Rabinowitz's cross-examination and taking                   |
| 18 | discrete topics; is that correct?                                      |
| 19 | MR GOLDSMITH: That is correct.                                         |
| 20 | MR JUSTICE ANDREW BAKER: If in the light of Mr Jones'                  |
| 21 | indication —— and that is fine —— that is how the                     |
| 22 | parties have approached it, the particular topics you                  |
| 23 | are turning to have not been shared and therefore by                   |
| 24 | definition they can't have been notified to Mr Shah,                   |
| 25 | I think I will say in fairness to Mr Shah, again you                   |

2

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | probably would have been doing this anyway, but I think                |
| 2  | it is important in the context of his very long                        |
| 3  | cross-examination that you are as clear as you can be                  |
| 4  | before you ask any questions: the topic we are going to                |
| 5  | deal with now is X, there will be some questions on                    |
| 6  | that, and when you finish those questions and there is                 |
| 7  | then another topic, just introduce that, because clearly               |
| 8  | for him he is in a sense in the middle of a process of                 |
| 9  | reliving these events and going through them in an order               |
| 10 | and we are asking him to switch into: now let's think                  |
| 11 | about whatever episode or aspect of the case it is that                |
| 12 | might even be jumping around a bit chronologically. Is                 |
| 13 | that all right?                                                        |
| 14 | MR GOLDSMITH: Absolutely, my Lord.                                     |
| 15 | MR JUSTICE ANDREW BAKER: Good morning, Mr Shah.                        |
| 16 | A. Good morning, my Lord.                                              |
| 17 | MR JUSTICE ANDREW BAKER: I hope you understood that. As                |
| 18 | you know, we are handing over to Mr Goldsmith for                      |
| 19 | cross-examination questions of you on behalf of SKAT                   |
| 20 | today. He is dealing essentially, as I understand it,                  |
| 21 | with a series of different and discrete topics and he                  |
| 22 | will do his best to make clear at the start of each                    |
| 23 | topic he is going to deal with what it is in general                   |
| 24 | terms he is turning to, so that you can have your mind                 |
| 25 | turned to that part of the case rather than the general                |

3

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | chronological flow of events that Mr Rabinowitz was                    |
| 2  | taking through, all right?                                             |
| 3  | A. That is clear, thank you.                                           |
| 4  | MR SANJAY SHAH (continued)                                             |
| 5  | Cross-examination by MR GOLDSMITH                                      |
| 6  | MR GOLDSMITH: Good morning, Mr Shah.                                   |
| 7  | A. Good morning.                                                       |
| 8  | Q. I am going to ask you first some questions about the                |
| 9  | Belgian and Austrian trading by GSS clients, if that is                |
| 10 | all right.                                                             |
| 11 | A. Yes.                                                                |
| 12 | Q. So you have already touched on the fact with                        |
| 13 | Mr Rabinowitz that the GSS trading occurred in respect                 |
| 14 | of German and Austrian shares, correct?                                |
| 15 | A. Yes, that's correct.                                                |
| 16 | Q. And you have told Mr Rabinowitz that the GSS trading in             |
| 17 | respect of Belgian and Austrian shares was structured on               |
| 18 | a cum-ex basis; that's right, isn't it?                                |
| 19 | A. Yes, that's correct.                                                |
| 20 | Q. And you have discussed with Mr Rabinowitz how in the                |
| 21 | context of the Danish trading under the GSS Trading                    |
| 22 | Model, equal and opposite trades were entered into and                 |
| 23 | then internally settled to zero. I don't intend to go                  |
| 24 | over that again so far as the Danish shares are                        |
| 25 | concerned, but can I just ask this: the Belgian GSS                    |

4

| | |
|---|---|
| 1  MR JUSTICE ANDREW BAKER: A cash collateral amount that will | 1  the answer to your question is it is not surprising. |
| 2  match an equity purchase, yes. | 2  Q. So Solo is guaranteeing them for 3 billion Danish krone. |
| 3  MR GOLDSMITH: Exactly yes, and we can see the cash | 3  I can't do the maths off the top of my head, maybe |
| 4  collateral amount here is 228,896,500, yes. | 4  Ms Nanchahal will help me, but that's going to be |
| 5  A. Yes, I see that. | 5  hundreds of millions of pounds, is it not? For |
| 6  Q. And the price is 45.7793 per share, yes? | 6  example —— |
| 7  A. Yes, I see that. | 7  A. In the region of £300 million. |
| 8  Q. And the cash rebate interest and cash rebate spread | 8  Q. And Solo Capital Partners does not have £300 million, |
| 9  figures, that's the interest on the cash collateral that | 9  does it, at this time? |
| 10 the stock lender has to pay, yes? | 10 A. Well, I think if we go back to the Solo Model we will |
| 11 A. Yes, I see that. | 11 see that there are matching incoming and outgoing cash |
| 12 Q. And here the interest rate is overnight DKK LIBOR plus | 12 amounts and that is why Solo would have been able to |
| 13 70 basis points. That is —— so in other words it is DKK | 13 guarantee a trade such as this. |
| 14 LIBOR plus 0.7%, yes? | 14 Q. But in a sense that is why it makes it so important that |
| 15 A. Yes, I see that. | 15 at the end of the day —— from Solo's perspective, at the |
| 16 Q. Can we then look at {MTKC6/729.1/1}. This, Mr Shah, is | 16 end of the day things do balance perfectly to zero, |
| 17 another stock loan confirmation from March 2013 with AOI | 17 because otherwise Solo is at risk on the guarantee, yes? |
| 18 as lender and Amalthea as borrower, and again, the way | 18 A. Yes. I absolutely agree. |
| 19 that my Lord described, this will be related to | 19 Q. Can we see here that the interest on the cash collateral |
| 20 an equity trade, a short sale trade that will have | 20 is overnight DKK LIBOR plus 70; that is 0.7 again, yes? |
| 21 happened a few days earlier, yes? | 21 A. Yes, that's correct. So it is 70 basis points, which is |
| 22 A. Okay, yes. So this is unrelated to the one that we just | 22 0.7%, yes. |
| 23 saw. | 23 Q. Thank you. Great. Can we now —— we might need to come |
| 24 Q. Yes. And here the notional —— the quantity of shares is | 24 back to those, so don't remove them altogether, but can |
| 25 3 million and the notional cash collateral is almost | 25 we go, please, to {MTKC1/607/1}. And this is |
| 109 | 111 |
| 1  3 billion Danish krone. That is a huge sum, isn't it? | 1  a spreadsheet, if Ms Nanchahal could control it, please. |
| 2  A. Probably not in real money, but yes, I agree that is | 2  Can we start with the "Statement" tab at the top. This |
| 3  a big amount. | 3  is Solo's open position statement for AOI dated |
| 4  Q. What do you mean not in real money? | 4  30 September 2013; do you see? |
| 5  A. That was my idea of a joke. But yes, that is a big | 5  A. Yes, I see that. |
| 6  amount of money. | 6  Q. Again, just to ground this, this was also a spreadsheet |
| 7  MR JUSTICE ANDREW BAKER: I think telling leading counsel on | 7  that Mr Rabinowitz went through in opening, just so you |
| 8  behalf of the Danish nation that Danish krone is not | 8  know. If we go to the stock loan —— sorry. |
| 9  a real currency was an attempt at humour. | 9  A. Sorry to interrupt. Are we moving away from TDC, |
| 10 MR GOLDSMITH: Yes, right, fair enough. | 10 because I will not be able to keep all these figures in |
| 11 MR JUSTICE ANDREW BAKER: I understand where you might have | 11 my head? |
| 12 gone with it, Mr Goldsmith, but on this occasion, | 12 Q. Don't worry, I will be reminding you. The reason I have |
| 13 I think let's just take that as humour. | 13 shown you three sets of trades is because actually their |
| 14 MR GOLDSMITH: If I told you that Amalthea had been formed | 14 accounting is ultimately related, but I will remind you |
| 15 in the Cayman Islands with limited capitalisation only | 15 of the terms as we go through. |
| 16 a month or so before this, it is pretty extraordinary | 16 A. Okay. |
| 17 for it to be committing to provide to buy shares worth | 17 Q. So if we start with —— if we start at row 287, you can |
| 18 nearly 3 billion Danish krone, no? | 18 see —— there we go, thank you so much —— TDC and in row |
| 19 A. My view is that the number of days between a company's | 19 289 it has 13 March 2013 and I can remind you that the |
| 20 incorporation and the day it starts trading is not | 20 settlement date for the TDC March stock loan was |
| 21 relevant. I also think the share capital amount is not | 21 13 September 2013 and in F289 it says, "Cash original", |
| 22 relevant. What I understand from this trade, and | 22 and that was the amount of cash collateral under this |
| 23 probably all the trades in GSS, is that they were | 23 loan, just to remind you of those figures. |
| 24 guaranteed by Solo, so if Solo has guaranteed it, then | 24    Do you see in G289 we have a rate of 0.63%. Do you |
| 25 that's why those numbers are there. So that —— for me, | 25 see that? |
| 110 | 112 |