# Exhibit 4
# Part 2

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                      - 8 -                                      June 20, 2014
Richard Markowitz
Adam LaRosa

As to the question of whether the performance of services for the Michelle Plan results in

the service provider being a disqualified person, while there is no direct guidance on this issue, it

is possible to make the argument that a service provider such as Solo does not become a

disqualified person until the agreements to provide services are entered into and, therefore, the

initial transaction between the plan and such service provider would not be prohibited.  However,

the Department of Labor ("DOL") could take the position that an exemption is necessary for

even the initial transaction to avoid being a prohibited transaction.  In addition, if the Michelle

Plan were to enter into identical or nearly identical transactions with Solo, the DOL could well

view Solo as a disqualified person upon it entering into the second (and such subsequent) such

transaction, even if it would not have challenged the first.  In this event, Solo (and any other

service provider) would need to show that they had met the requirements for an exemption for

their activities with respect to the Michelle Plan.

### D.    Exemptions

The Code provides for exemptions to the prohibited transaction rules.[9]  Section

4975(d)(2) of the Code provides an exemption, called the "Service Provider Exemption", from

the prohibited transaction provisions of Section 4975(c) for "any contract, or reasonable

arrangement, made with a disqualified person for other services necessary for the ... operation of

---

[9] Section 4975(d)(2) also provides an exemption for transactions for certain of the prohibited transactions for a
disqualified person other than a fiduciary (or an affiliate) who has or exercises any discretionary authority or control
with respect to the investment of the plan assets involved in the transaction or renders investment advice with
respect to the assets, solely by reason of providing services to the plan but only if the plan receives no less than, and
pays no more than, adequate consideration.  It is not clear how the concept of "adequate" consideration applies to
loans.  In addition, this exemption does not exempt prohibited transactions under Section 4975(c)(1)(D), (E) or (F).

Michelle

**CONFIDENTIAL / PRIVILEGED - SUBJECT
TO 502(d) ORDER**                                                                    **WH_MDL_00140673**

**KAYE SCHOLER** LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                            - 9 -                            June 20, 2014
Richard Markowitz
Adam LaRosa

the plan, if not more than reasonable compensation is paid therefor".[10] The contract or

arrangement also must permit termination by the plan without penalty on reasonably short notice

under the circumstances to prevent the plan from being locked into an arrangement that has

become disadvantageous.

In addition, Section 4975(d)(b) of the Code provides an exemption for the receipt by a

disqualified person of any reasonable compensation for services rendered or the reimbursement

of expenses actually and properly incurred in the performance of duties with the plan (so long as

the person is not also receiving full time pay by the employer or employee organization

maintaining the plan).  As with the Service Provider Exemption, the compensation must be

"reasonable."

The Treasury Regulations provide that, generally, whether compensation is reasonable

depends on the particular facts and circumstances of each case[11].  However, any compensation

which would be considered excessive under Section 1.162-7 of the Treasury Regulations will not

be reasonable for purposes of these exemptions.[12]  Therefore, the burden of proving that no

prohibited transaction has occurred would be on the  service provider, as well as on the fiduciary

of the Plan involved.  The reasonableness of any fee will ultimately be a facts and circumstances

question.

---

[10] Certain of the exemptions under Section 4975, including this exemption do not apply to certain transactions in which a plan lends money or pays compensation or buys or sells from or to an owner-employer or certain parties related to an owner employee.  We understand that these facts are not present in this case.
[11] Treasury Regulation 54.4975-6(e)(2).
[12] Treasury Regulation 54.4975-6(e)(6).

Michelle

**CONFIDENTIAL / PRIVILEGED - SUBJECT
TO 502(d) ORDER**

**WH_MDL_00140674**

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                         - 10 -                         June 20, 2014
Richard Markowitz
Adam LaRosa

As discussed herein, the arrangement between the Michelle Plan and Solo provides for payment to Solo of 66% of the gross amount payable from the transactions; from this amount Solo is required to pay significant expenses associated with the transaction which expenses are in addition to any fees paid by the Michelle Plan. If this 66% were to be viewed as a fee for services, or compensation, to Solo, it would appear to be large compared to many investment fee relationships. However, the 66% represents the gross amount payable to Solo so that after the payment of its fees to third parties (including trading commissions, legal fees, brokerage fees, accounting fees, reclaim services, custodial service fees, leverage providing fees and guaranty fees paid by Solo), Solo's net "compensation" was less than the 66% and perhaps considerably less.

Given the size of the payments to Solo in this matter, we would expect the DOL to closely scrutinize the fee by looking at the fees charged for similar services, if any, as well as the time and effort expended by Solo. We would also expect that the DOL would look at how much of the amount is actually compensation to Solo and how much is payment to third party providers, and to what extent the payment to third party providers is reasonable compensation. In this regard, we understand that Solo and other unrelated providers have and do provide similar arrangements to other investors (both plans and non-plan investors) under arrangements in which the investors share of the net proceeds is as low as 10%[13]. We also understand from you that the trustees of the Michelle Plan were not able to find a provider which would provide similar investment services at a lower cost. This indicates that the amounts paid to Solo are consistent

---

[13] Because these are private contractual relationships, the details of these transactions are not available to us.
Michelle

**CONFIDENTIAL / PRIVILEGED - SUBJECT
TO 502(d) ORDER**

**WH_MDL_00140675**

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    - 11 -                                    June 20, 2014
Richard Markowitz
Adam LaRosa

with or less than those charged other investors.  In addition, many hedge fund managers charge a

fee of 20% or more of profits (we understand that some managers charge a fee of up to 50% of

profits), which indicates that market demands often result in arrangements for fees which appear

large but which are deemed by investors as appropriate to attempt to obtain a desired return.[14]

In addition, we would expect that the analysis would consider how much of a return the

Michelle Plan received, compared to that of Solo and other service providers.  We understand

that the return to the Michelle Plan has been very favorable even after the payments to Solo.

While the documentation of the transaction cannot be ignored, it should also be noted that

the intent of the parties was that the arrangement was in the nature of a partnership in which each

partner would receive a portion of the gross amount, with Solo bearing all of the costs.  In this

context, the provision of a larger allocation to Solo reflects the agreement of the parties that Solo

was essential to the transactions, that the transactions might otherwise not have been possible,

and that Solo was incurring large expenses to effectuate the transactions.

The Treasury Regulations provide that the Service Provider Exemption does not apply to

"self dealing transactions by fiduciaries" – that is, fiduciaries dealing with the income or assets

of a plan in their own interest or for their own account or receiving consideration for their own

personal account from any person dealing with a plan.  We understand that none of the trustees

of the Michelle Plan are receiving or have received any direct or indirect benefit or gain from

these transactions.

---

[14] These fees are often part of a complex fee structure which often results in lower fees if certain hurdles are not met.
Michelle

**CONFIDENTIAL / PRIVILEGED - SUBJECT
TO 502(d) ORDER**

**WH_MDL_00140676**

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    - 12 -                                    June 20, 2014
Richard Markowitz
Adam LaRosa

### E.    **Application to Service Providers**

It is possible that Solo could be a "fiduciary" (described in Appendix A) with respect to

the Michelle Plan. If so, the DOL could take the position that the Service Provider Exemption

does not apply if Solo uses its authority, control or responsibility to cause the plan to pay

additional fees to it or otherwise pay fees which may benefit Solo or influence its judgment as a

fiduciary. This could be the case, for example, if Solo could authorize additional, unnecessary

trades which resulted in increased fees to it. In this regard, you have informed us that Solo has

no authority over the fees, and no authority to authorize additional fees or additional trades that

could result in additional fees, but that all such trades are authorized on behalf of the Plans by

Mr. LaRosa and that Solo merely effectuates those orders.

As described in this memorandum, Mr. LaRosa has performed services for the Michelle

Plan, and therefore is a service provider and is likely also a fiduciary. We understand that Mr.

LaRosa is also a disqualified person because of his ownership of a profits interest in Argre.[15]

The compensation paid to him will need to qualify under the Service Provider Exemption (or

other exemption) and so must be "reasonable". While this is a question of fact, we understand

that substantial work is involved on Mr. LaRosa's part and so the fee of $5,000 would not seem

unreasonably large. We also understand from you that Mr. LaRosa does not have any authority

to cause this fee to be paid or to increase the amount of the fee.

---

[15] Mr. LaRosa would also appear to be a disqualified person under Section 4975(e)(2)(I) of the Code because he is a 10% or more partner in Argre, which is an entity in which 50% or more of the partnership interests are held by trustees of the Michelle Plan.

Michelle

**CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER**

**WH_MDL_00140677**

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                           - 13 -                          June 20, 2014
Richard Markowitz
Adam LaRosa

Payment for the services performed by the third party service provider who files the tax

reclaim form or other providers who Solo may pay to perform related services could also be a

prohibited transaction unless it meets the Service Provider Exemption (or other exemption).  This

compensation seems less burdensome on the Michelle Plan than the fees paid to Solo and, for

this reason, we believe less likely to be challenged by the DOL, although as noted in the Facts,

Solo does not break out the amount of those fees and disclose them to investors.

     F.    **Extension of Credit**

As noted above, an extension of credit between a plan and a disqualified person

constitutes a prohibited transaction.  The DOL could look at Solo's guaranty of the trades as an

extension of credit to the Michelle Plan rather than a service in connection with this investment

or as an advance to cover direct expenses which are to be repaid, and take the position that the

extension of credit is not exempted by the Service Provider Exemption.  It could be argued that

the guaranty is a necessary service in order to enter into the investment, and that the Service

Provider Exemption should apply to exempt the guaranty, if its requirements are met.  This

would give Solo the burden of proving that the fees were reasonable and necessary.  Again, even

if the DOL did not view Solo as a disqualified person in the initial transaction between it and the

Michelle Plan, it could take the position that Solo became a disqualified person when later

transactions were consummated.

The DOL has issued an exemption for certain securities lending transactions but those are

not discussed in this memorandum since it is our understanding that Solo will not receive

Michelle

**CONFIDENTIAL / PRIVILEGED - SUBJECT
TO 502(d) ORDER**

**WH_MDL_00140678**

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                          - 14 -                          June 20, 2014
Richard Markowitz
Adam LaRosa

compensation for securities lending services that will be entered into with an unrelated third

party which is not a disqualified person.

### G.    Other Issues

The Facts section in this memorandum is intended to provide the factual basis for other

memorandum, and so all facts may not be required for the analysis hereunder.  This

memorandum does not address other issues other than those specifically addressed herein.

Michelle

**CONFIDENTIAL / PRIVILEGED - SUBJECT
TO 502(d) ORDER**

**WH_MDL_00140679**

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                             - 15 -                          June 20, 2014
Richard Markowitz
Adam LaRosa

Appendix A - Terms

This Appendix A briefly describes certain terms used in this memorandum.[16]

**Definition of a Prohibited Transaction.** A prohibited transaction includes (i) the sale or exchange of any property between, or the lending of money or any other extension of credit between, or the furnishing of goods or services between, a plan and a disqualified person (Section 4975(c)(1)(A), (B) and (C)), (ii) a transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan (Section 4975(c)(1)(D)), (iii) the act by a fiduciary whereby he deals with the plan income or assets in his own interest or for his own account (Section 4975(c)(1)(E)), or (iv) or the receipt of any consideration for his own personal account by a disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan (Section 4975(c)(1)(F)).

**Definition of a Disqualified Person.** Section 4975(e)(2) defines a disqualified person to include:  (A) a fiduciary; (B) a person providing services to the plan; (C) an employer any of whose employees are covered by the plan; (D) an employee organization any of whose members are covered by the plan; (E) an owner, direct or indirect, of 50% or more of the combined voting power of all classes of stock entitled to vote or total value of shares of all classes of stock of a corporation, or of the capital interest or profits interest of a partnership or of the beneficial interest of a trust or unincorporated enterprise which is an employer or employee organization described in (C) or (D); (F) a member of the family (as defined) of any individual described in (A), (B), (C) or (E); (G) a corporation, partnership or trust or estate of which (or in which), 50%

---

[16] These terms are defined in Section 4975 of the Code and this discussion is subject to those definitions.
Michelle

**CONFIDENTIAL / PRIVILEGED - SUBJECT
TO 502(d) ORDER**                                                    **WH_MDL_00140680**

**KA**YE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                          - 16 -                          June 20, 2014
Richard Markowitz
Adam LaRosa

or more of the combined voting power of all classes of stock entitled to vote or total values of

shares of all classes of stock of a corporation, or of the capital interest or profits interest of a

partnership or of the beneficial interest of a trust or estate, is owned directly or indirectly or held

by persons described in (A), (B), (C), (D) or (E); (H) an officer, director (or person having

similar powers or responsibilities), a 10% or more shareholder, or a highly compensated person

(earning 10% or more of the yearly wages of an employer) of a person described in (C), (D), (E)

or (G); or (I) a 10% or more (in capital or profits) partner or joint venturer of a person described

in paragraphs (C), (D), (E) or (G).

**Definition of Fiduciary.** Section 4975(e)(3) defines "fiduciary" as any person who (i)

exercises any discretionary authority or discretionary control respecting management of such

plan or exercises any authority or control respecting management or disposition of its assets, (ii)

renders investment advice for a fee or other compensation, direct or indirect, with respect to any

moneys or other property of the plan or has any authority or responsibility to do so, or (iii) has

any discretionary authority or discretionary responsibility in the plan administration.

\*   \*   \*   \*   \*

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department
regulations, we inform you that any U.S. federal tax advice contained in this correspondence
(including any attachments) is not intended or written to be used, and cannot be used, for the
purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or
(ii) promoting, marketing or recommending to another party any transaction or matter addressed
herein.

Michelle

CONFIDENTIAL / PRIVILEGED - SUBJECT
TO 502(d) ORDER

WH_MDL_00140681